Good morning, Your Honor. May it please the Court. My name is Jihan Thomas, and I represent petitioners in this case. We ask this Court to find that Mailoa's active participation with the Afghan USA movement and his administration in front of the Indonesian consulate constitute or qualify as a change under AUSC 1158-2D. This Court has considered the change circumstance before in Fekri v. Mokassi, and held there could be a change circumstances even though the applicant owes fear for persecution so long as there is new objective evidence that occur that materially affects that person's eligibility for asylum. Now the most important objective evidence that appeared here in the Mailoa's case is that the Indonesian government now identify Mr. Mailoa as an FKM activist because he appeared in front of the Indonesian consulate and demonstrated and requested the sovereignty of the Maluku Islands. Is there evidence of that? Yes, Your Honor. That would be under the witness that testified, which is the head of the Maluku government at administrative record ER 193, 194, 195. There was also pictures of the demonstration in front of the Indonesian consulate, and that would be at record 344, 345, 344 and 345. I'm less concerned about whether he participated in the demonstration as to whether he's been identified by the Indonesian government. Well, the head of the movement has testified, and there was no evidence that he's not credible, that he said that the personnel or the consulate personnel has taken photograph of all the administrators to identify them and persecute them upon their return to Indonesia. So that is in the record, Your Honor. What evidence is there about persecution of others that were in that demonstration upon return? None of them have returned, Your Honor. So there's no evidence to that effect. Somebody demonstrates in front of a consulate, okay. How do we know that's going to lead to something that has adverse consequences? Because, Your Honor, there are evidence that all FKM activists in Indonesia have been tortured, have been attacked and have been arrested. That's in the record, Your Honor. That would be on administrative record 353, 450 through 584. And there is a torture of all FKM activists that identified at 394, 395, 396, 471 and 483. So, Your Honor, the agency dismissed these circumstances on two grounds. First, it said that Mr. Mayol had the subjective fear from before and even fled Indonesia. And he even wanted to apply for asylum and consulted with an attorney in the year 2000. The second ground, they said, he was aware since 2001 that the FKM persons are being persecuted in Indonesia and that does not transmute an old event into a change. Well, this court held in Vahora v. Holder, there could be a change of circumstances even if the alien meant to apply for asylum and always feared persecution. Also, this honorable court in Fekri v. Mukasi have held, there is no support in our statute or case law that an applicant does not qualify for a change, even if he had the subjective intent to apply for asylum and that intent existed before the expiration of the one year. So, that's why... What changed? Well, what changed, Your Honor, here we believe is two, there was increased violence against the FKM movement, more killing as documented in the Human Rights Report at page 491. Also, Your Honor, the new change that happened is now that Mayola is identified as FKM activist because of his public opposition to the Indonesian government when he demonstrated in front of the council. So, that is that new change. That is the same change that this honorable court has found in Fekri v. Mukasi. He was a member of the MFDC movement since 1992. He always had the subjective fear. Yet, this court found a change because it held that the Senegalese government now could identify him and he could be persecuted on that basis alone. And we asked that this court... It's a little perverse, isn't it? If somebody has fear, so leaves, doesn't apply for asylum, sends something to the government that he fled saying, hey, I'm really against you, you better make sure you get me if I get back to the country, and then says, well, look, that's a changed circumstance, so now I'm eligible to apply for asylum even though I disregarded the asylum application before. Isn't that what we have here? Well, I understand, Your Honor, but what happened in Vahora v. Holder? He was beaten, he was attacked, he was detained before coming in 1999. Yet, this court found a change because it said there is a new change. The temple was attacked and his brother disappeared. So despite the fact that he's been attacked and suffered multiple incidents of persecution, this court still found a change because... Well, those are changes that all happened back in the country. Your change is one that happened here because he identified himself by participating in the demonstration. That is correct, Your Honor. And that is exactly the changed circumstance that H.C.R. 1208.484ib talks about when it says activities that the applicant becomes involved outside the country of feared persecution that places him at risk. And this is exactly what happened. Mr. Mayola became active with the FKM movement, and his activities with the FKM movement would place him at risk upon his return. And there's ample record that they are being tortured, arrested, and killed. The way I understand your case is that the IJ concluded, held, that the one year that the delay following the alleged change in circumstance was unreasonable. Did you raise that at all to the BIA? I didn't know, Your Honor, but... Well, then you're out. But let me tell you something, Your Honor. We don't believe that the movement or the membership of that movement is just only the change. It is a continuing of an active participation that led... You didn't raise to the BIA the issue of that holding, that it was unreasonable. You didn't exhaust it. We don't have jurisdiction even to hear this. Your Honor, like I told you, I'm not seeing this as an event where a membership and then whether he fall within a reasonableship of his membership of the FKM movement. This is an event that can... What did you raise to the BIA? I did raise to the BIA that there was a change of circumstance, and I also raised to the IA that the agency dismissed it because they don't believe that it was a new circumstance. It was an old event that he always meant. So I did raise the issue. And as a matter of fact, this Court in Zang v. Ashcroft said, just the petitioner request to reverse a denial of a cat relief is sufficient to have raised the issue before the Board. So I would like to ask this Court to move to the next issue. We ask this Court to find that both Victor and Siska were minor and dependent... What you're missing there is that they filed a purely derivative claim. That is correct. And we ask that this Court grant them asylum under this Court holding in El-Hemry v. Ashcroft. Moosab came... But let me address this. The IJ and the Board denied the claim for legal disability based on two different grounds. The IJ found that the children or the age of a minor is under 21 and said that Siska passed 21, but he's still protected under child protection status, but denied the legal disability based on the fact they were a competent minor. Well, Your Honor, in El-Hemry, Moosab was accompanied by his mother Haifa when he came in, and this Court still found him to be a minor because he was derivative on his mother's application. Victor and Siska were also derivative on their father's application, despite the fact that, you know, they passed the age 21. So you're asking us to remand it? Yes, I ask that this Court remand it. With the adverse credibility finding. I'd like to address this one right now, Your Honor. And I ask that this Court reverse the adverse credibility. I will start with the two minors. This traumatic event occurred when the children were at age 11 and 9, and this agency is asking these children to answer every question with clarity, precision, vividness, and also penalizing for not remembering anything. So the agency is claiming that there was a discrepancy between Victor and Siska on how Victor was hit. By a stick? Well, Siska, his brother, said he was hit in a stone around the temple area. Now, a careful review of the record, Victor testified, Your Honor, I'm escaping death. I was still a kid. I can't remember what hit me. If anybody to tell you it would be my brother, that would be administrative record 288 and 289. So Victor never specifically said whether a stick or was a baseball bat. He said, I cannot remember. Ask my brother. When the brother testified, he clarified that he saw blood coming from Victor's head at AR 314. He even testified at AR 325 that I saw my brother hit with a stone to the head. And if we consider what is a stone to the temple, the temple is part of the head. The agency is also saying there's discrepancy in how each child described how Joseph died. Victor said Joseph was decapitated. Yet, Your Honor, Siska, when he was asked how did Joseph die, he said he was pulled and shoved at AR 310. Shoved meaning decapitated, synonymous to being, you know. And then when he asked also how was he shoved, he explained further. They stabbed him to the chest. Counsel, your time has expired. Thank you very much. We'll hear from the government. Thank you so much. Good morning, Your Honors. Jeffrey L. Mencken, United States Department of Justice for the Attorney General. I will apologize in advance if my voice kicks out. I've been having a rough week. Me too. I do have a lozenge, which I hope does not interfere. Your Honors, the four petitioners here filed one asylum application with the father as lead and the other three as derivatives. Whether or not that asylum application was timely, and it was untimely by almost four years, all of the petitioners' persecution claims were heard by the immigration judge and were found to be incredible. And the board's rather thorough and reasoned adverse credibility finding and the immigration judge's before that, I believe, is dispositive of all of the relevant issues here. Let me ask you to focus on the question that's raised by our order. El Hemry suggests that the minors can be treated separately, not subject to the one-year asylum bar, and the denial of the application here with regard to asylum was based on the one-year asylum bar.  Yes. It's not clear, Your Honor, what was referred to in Hemry. There was no controversy there over whether or not the minor's application was timely because the IJ considered it, and there's no explanation of why he or she considered it. There's no statutory or regulatory authority saying that any minor is exempted from the one-year bar. There are exceptions, and they did argue before the board that extraordinary circumstances existed because they were legally disabled. But I don't think, and we've submitted a couple 28J letters on this issue generally, the only exemption from the one-year bar is for an unaccompanied minor. There's no claim that these minors were unaccompanied. They were clearly accompanied. Well, there is a regulation that identifies as a changed circumstance the fact of turning 21. That is true, but that was never – there was no argument ever at any posture in this case that the two sons experienced changed circumstances. The father – They turned 21. That's defined by the regulation as a changed circumstance, isn't it? They never raised that. The child victim – where is that? The Child Status Protection Act provides that if a minor who is listed as a derivative passes the age of 21, they do not automatically age out. They can elect to, and there was no election here. And it's very clear from the record, let me point out two pages, where the minors did file, and the wife did also, their own withholding application because the immigration judge, and this is at page 204, in January of 2006, the immigration judge explained that if they wish to be considered for withholding, they need to file their own applications because that is not derivatively available. Do you want to do that? And counsel says yes. In May of 2006, at page 210, the judge acknowledges the filing of withholding applications, asks the attorney if that's what you wanted to do, and she responds yes. So the idea that they – they never applied for asylum on their own behalf. They chose to remain derivatives throughout. But I would go back to my earlier point that everything that – the applications that they did file didn't raise any claims that weren't heard by the judge. In fact, there's no narrative of what their claim is. They refer entirely to their father's application, and that's at 1062 and 1116. The parent's application refers to what happened to the children. So they're wrapped together. Oddly, the father never does refer to what happened to the children, but the judge heard testimony on it. The presentation, the more dramatic illustrations of injury seem to have to do with the children, and certainly the immigration judge discussed them and heard them and discussed them as a set. But he did not make a ruling on any of the asylum applications or the asylum application as to any of the individuals separate from the one-year bar. But the operative claims were the same, whether it's withholding or whether it's asylum. There was nothing different. Well, the standards are different. I mean, the fact that he denied withholding doesn't necessarily stand as a determination that asylum is denied, if the merits are reached. Well, if he denied asylum, Your Honor, because he found the claim that all of the factual allegations to be incredible. I don't think so. I mean, where in the IJ's decision or the VIA's decision is asylum rejected based on incredibility? It's not asylum, Your Honor, but if the factual allegations are incredible, they're not suddenly incredible when the same claims underlie all relief applications. Well, you can say that. I can project that. But we're only supposed to pass on what the agency has said, and I don't see anything where the agency has said what you just said. Well, the board itself did say that there's no error in the credibility finding, and it concludes in the record at page 6, we agree with the immigration judge that the respondents failed to carry their burden of proof for asylum and withholding of removal. So that does sweep it all together. But my point, Your Honor, is if you claim I was hit in the head, I'm entitled to withholding, and that hit in the head claim was found to be incredible, then you're not credible whether it's asylum, withholding, or what have you. So there's no ---- So it wouldn't have been hard for the agency to offer an alternative basis for its ruling on asylum. Well, the board could have, Your Honor, certainly. But it didn't. It didn't, but it didn't. The adverse credibility finding is thorough. It's cogent. It gives specifics. The four individuals couldn't agree on basic facts of their allegation, and it is not the board's obligation to sort through those and to weave its own narrative, to pick out ---- Well, it is the board's obligation to rule on applications, and it ruled on the application for asylum by saying one-year bar. It didn't say anything else. You're asking us to say something else. I mean, the government's constantly reminding us we can only pass on what the agency's done. What the agency did here was not deny asylum based on incredibility. And I'm not asking the Court, and if I created that impression, I apologize. There is a one-year bar. It's valid, and it should be upheld. The withholding application was denied because the claims, all four claims, were incredible. And that should be upheld. The minors didn't become eligible for asylum under Henry. We don't know exactly what the Court was going for there. But under the law that was explained by the board and in the statutes that we set out in our 20HA letters, they elected to remain derivatives. That was their choice. And unless there are other questions that the Court would have, I'd be happy to address them. But the immigration judge gave the parties an opportunity to explain the discrepancies, and they couldn't. This is a classic adverse credibility finding, and there's no compelling evidence that would command the Court to choose one story over another. All right. Thank you, Counsel. Thank you, Your Honor. There is one point I would like to get to, Your Honor, while I do have a moment. They're not squarely raised. There was a 20HA letter that brought to the Court's attention Tampalon, which is a disfavored group case. That postdates the immigration judge's finding here. And for the same reason that I said before, I don't think that a remand is necessary for that, for a disfavored group analysis, because of the adverse credibility determination. The Court's Wackery decision makes clear that you need a large quantum of individualized evidence for a disfavored group analysis. And I would refer the Court to the Halim decision at 590 F3rd 971. Is that in your 20HA letter? No, I'm afraid it wasn't, Your Honor. Before you leave the Court today, provide copies of that citation to the Court and to opposing counsel. I certainly shall, Your Honor. And I apologize, but there was a flurry of 20HA letters, and I just had to come out here before I could get to this one. But particularly Judge Cudahy's concurrence, in which he says that when a testimony lacks credibility, there's no basis for a remand for an evidentiary analysis. And I think that that is exactly what is called for here. Very well. Anything further, counsel? No, nothing else, Your Honor. Unless the Court has any other questions, we will rely on our briefs and ask that the Board's decision be upheld. Very well. The case just argued will be submitted for decision.
judges: O'scannlain, Trott, Clifton